## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JAMES R. GROVE,**           :     **Civil No. 1:05-CV-02205**
**DENNIS S. KRONE,**           :
**PATRICIA STEGMAN, and**     :     **JUDGE SYLVIA H. RAMBO**
**DANIEL RILEY,**              :

         **Plaintiffs**          :

            **v.**                :

**CITY OF YORK,**            :
**PENNSYLVANIA,**           :

         **Defendant**       :

## M E M O R A N D U M

Plaintiffs, anti-abortion activists and protesters, allege that Defendant City of York violated their First Amendment rights of free speech, free assembly, and free exercise of religion by actions taken against them before and during the 2004 and 2005 York Halloween Parades. They claim that the City had a policy or custom of discriminating against them because of the content of their message. They allege that Mayor John Brenner and Director of Public Works James Gross were City policymakers such that the actions they took toward Plaintiffs should be attributed to the City itself for purposes of § 1983 liability. On these cross motions for summary judgment, the court concludes that there are not genuine issues of material fact regarding the alleged violation of Plaintiffs' First Amendment rights, but there are contested issues of fact with respect to damages. For the reasons that follow, Plaintiffs' motion for summary judgment will be granted in part and denied in part. Defendant's motion for summary judgment will be granted in part and denied in part.

I.          **Background**

    A.   **Facts**

        The following facts are undisputed, except where noted.  Plaintiff
James Grove is the pastor of the Heritage Baptist Church located in Seven Valleys,
Pennsylvania.  Plaintiffs Dennis Krone, Patricia Stegman, and Daniel Riley, are
members the Heritage Baptist Church.  Plaintiffs share the sincere religious belief
that abortion is a sin.  They further believe that they are charged to preach, in public
forums, against the practice of abortion.

        Defendant City of York is a Third Class City, organized and existing
under the Optional Third Class City Charter Law of Pennsylvania, 53 Pa. Cons. Stat.
Ann. §§ 41101-45000.  *York City Government*,
http://www.yorkcity.org/gov/GovHome.htm (last visited Jan. 5, 2007).  The City has
organized annual Halloween parades for the public for many years, pursuant to
Article 505 of the Codified Ordinances of the City of York.  Each year, the City
required all entrants in the parade to obtain a permit to march.  The City did not
grant permits on the day of the parade.  The City provided "General Parade
Regulations" to all persons who submitted applications to participate in the parade.
(*See* Pls. [*sic*] App. in Supp. of Their Mot. for Summ. J. ["Pls.' App."] 9-16; Def.'s
Ex. N.)  The regulations did not identify the manner in which the order of
appearance in the parade was determined.

        On the day of the 2002 Halloween Parade, a group from Heritage
Baptist Church, including Plaintiff Grove, arrived at the parade assembly grounds.
*Grove v. City of York*, 342 F. Supp. 2d 291, 296 (M.D. Pa. 2004) ("*Grove I*").[1]  They
did not have a permit, but they intended to join the parade to preach against the

---

[1]An exhaustive recitation of the facts surrounding the 2002 and 2003 Halloween Parades are
set forth in *Grove I*.  This summary suffices for present purposes.

practice of abortion while carrying an assortment of signs, some containing Bible verses and others depicting aborted fetuses. *Id.* Initially, they were permitted to walk along the route before the parade officially began, but after altercations with the crowd, they were instructed to leave the street. *Id.* at 297. Police confiscated their signs with photographs of aborted fetuses. *Id.* at 298. Plaintiffs filed a civil rights claim against the City of York and a number of individual defendants based on the events at the 2002 Halloween Parade.

In 2003, Plaintiff Grove applied for and was issued a permit to participate in the Halloween Parade. *Id.* The City issued a press release, on October 23, 2003, notifying the public that his permit had been granted. It stated that the "information that he plans to distribute may be considered offensive or graphic by recipients and it may not be appropriate for all audiences." (Pls.' App. 7.) The statement notes his constitutional right to distribute the information, but asserts that the information "does not reflect the views of the City of York." (*Id.*)

On the day of the 2003 parade, Plaintiff Grove's group arrived at the assembly grounds, again with large signs featuring photographs of aborted fetuses. *Grove I*, 342 F. Supp. 2d at 299. Assistant Solicitor Donald Hoyt informed Plaintiff Grove, on behalf of the City of York, that he would not be allowed to participate in the parade if he insisted on carrying the signs. *Id.*; (Hoyt Dep. 12:25-13:10, Sept. 13, 2006.) The City feared violence if he participated in the parade carrying the signs showing aborted fetuses. *Grove I*, 342 F. Supp. 2d at 299. Plaintiff Grove and his group chose not to march in the 2003 parade at all because their signs were prohibited. *Id.* Plaintiffs added civil rights claims for the events that occurred in 2003 to their suit filed in 2002.

On June 9, 2004, this court entered partial summary judgment in *Grove I*. 342 F. Supp. 2d at 316-17. Following negotiations by the parties, this court

issued an injunction requiring the City of York to allow Plaintiff Grove and his group to participate in the annual Halloween Parade. Order, *Grove v. City of York*, No. 1:03-CV-00198 (M.D. Pa. Sept. 30, 2004). The City was ordered not to condition the group's appearance on the absence of signs or posters depicting aborted fetuses. *Id.* The group was required to abide by the duly promulgated rules and regulations for the parade. *Id.* The City was ordered to allow the group, during and after the parade, to walk or stand on the sidewalks of the parade route to distribute their literature, display their signs, and preach. *Id.* After the court order, the parties to *Grove I* signed a settlement agreement to end the dispute.

In 2004 and again in 2005, Plaintiff Grove applied for and was granted permits to participate in the Halloween Parades. Each year, his entry was positioned behind all other parade entrants by James Gross, Director of Public Works.[2] (Resps. to Pls.' Interrogs. Directed to Defs. ¶ 4; Pls.' App. 19.) Mr. Gross determined the order in which the parade entrants would proceed after consulting with Captain Arnold of the York City Police regarding public safety. (Resps. to Pls.' Interrogs. Directed to Defs. ¶ 4; Arnold Dep. 16:25-17:3, Sept. 13, 2006.) The police were concerned with maintaining Plaintiffs' security in the face of hostility from the crowd. (Arnold Dep. 11:17-23.) Captain Arnold and his traffic safety sergeant agreed that Plaintiffs' safety and the safety of the parade-going public would be best protected if their entry was "towards the end" of the parade. (*Id.* 13:9-18.) If

---

[2]A National Guard humvee was listed on the parade manifest to follow Plaintiffs' entry in the 2005 parade. (Stegman Dep. 22:3-6, Sept. 14, 2006.) On the day of the parade, however, the humvee did not appear at the staging area, thus Plaintiffs' entry was again last. (*Id.* 22:3-8.)

Plaintiffs contend that they were excluded from the parades in both years because they were placed behind a City fire truck, which they claim is traditionally the last entry in the parade. (Grove Dep. 23:22-24:7, Sept. 14, 2006; Pls. [*sic*] Br. in Supp. of [*sic*] Mot. for Summ. J. 12.) Defendant does not dispute that Plaintiffs were after the fire truck for some or all of the parades in each year, but assert that Plaintiffs were nonetheless included as an official entry in the parades. For purposes of the constitutional legal analysis required here, the parties' conflicting interpretations of the position in which Plaintiffs walked are immaterial.

Plaintiffs were last, the entire parade would not be delayed if an incident arose that stopped Plaintiffs' forward progress.  (Unsworn Decl. of Capt. David J. Arnold ["Arnold Decl."] ¶ 5.)  The police would have better access to Plaintiffs if an altercation occurred.  (*Id.*)  There would be more staff available to respond if Plaintiffs were placed last because uniformed officers were stationed at various intersections along the parade route.  (*Id.*)  As the end of the parade passed an officer's intersection, the officer would be free to provide additional protection for Plaintiffs as they walked.  (*Id.*)

Plaintiffs' entry in the 2004 Halloween Parade was entitled "Dr. Butcher's Chop Shop."  (Pls.' App. Attach. C.)  It consisted of a van with a photograph of an aborted fetus, large enough to extend down the whole side of the van.  (Stegman Dep. 12:2-5; Pls.' App. Attach. C.)  The van was also decorated with small mock coffins, bearing the inscription "Baby Girl" and "Baby Boy."  (Pls.' App. Attach. C.)  Members of Plaintiffs' group walked in front of the van with signs containing bible verses, exhortations to repent, and admonitions against the practice of abortion.  (*Id.*)  The group members dressed in scrubs, some wearing surgical masks.  (*Id.*)  Some members distributed anti-abortion literature.  (Grove Dep. 18:5-11.)  Plaintiff Grove walked towards the front of Plaintiffs' entry in the parade, using a bullhorn to amplify his voice as he preached against the practice of abortion, among other "sinful" acts.  (Pls.' App. Attach. C.)

During the parade, a parade-goer named Brian Wade informed Plaintiff Grove that Mayor Brenner had warned the crowd ahead that Plaintiffs' group would be walking at the end of the parade and to protect their children from the sight of the graphic photographs.  (Grove Dep. 26:3-27:16; Stegman Dep. 14:24-15:13; Pls.' App. Attach. C. )  Further, as Plaintiffs' entry approached the reviewing area, the parade announcer said that "as Mayor Brenner had said at the beginning, [the York

City fire engine] is being followed by something you may well not want your children to see, so this is basically the end of the parade.  The last entry in the parade is entitled Dr. Butcher's Chop Shop, displaying the horrors of abortion and the wickedness of Halloween."  (Pls.' App. Attach. C; *see* Grove Dep. 27:11-28:5; Stegman Dep. 15:3-7.)  Mayor Brenner did not recall warning anyone about Plaintiffs' presence in the parade.  (Brenner Dep. 24:5-15, Sept. 13, 2006.)

There were a number of vocal objectors to Plaintiffs' message during the 2004 parade.  A few items were thrown at Plaintiffs from the crowd.

Before the 2005 Halloween Parade, the City of York issued a press release entitled "Note to Parents Regarding Halloween Parade."  (Pls.' App. 8.)  It stated that Plaintiffs had applied to participate in the parade and would be allowed to march.  (*Id.*)  It noted that the information they planned to distribute "may be considered offensive or graphic by the recipients and it may not be appropriate for all audiences."  (*Id.*)  The press release reminded readers that he had the right to distribute the material, but that his pamphlets and his parade entry "[did] not reflect the views of the City of York."  (*Id.*)

Plaintiffs' entry in 2005 was entitled "Baby Disposal Service."  (Pls.' App. 5-6.)  Plaintiffs' van carried three large signs depicting aborted fetuses (Pls.' App. Attach. D.)  The van was again decorated with small coffins.  (*Id.*)  Members of Plaintiffs' group carried signs depicting aborted fetuses and others with written slogans and Bible verses.  (*Id.*)  Members of Plaintiffs' group dressed in scrubs, some wearing surgical masks.  (*Id.*)  A member of their group preached as he walked, amplifying his voice with a bullhorn.  (*Id.*)  At the beginning of the parade, there was a verbal altercation and some shoves exchanged between Plaintiff Grove and members of the group in front of Plaintiffs' entry.  (*Id.*)  The police stepped in and separated the groups.  (*Id.*)  The police inserted a York City fire truck between

6

Plaintiffs and the preceding entry.  (*Id.*)  Along the route, some members of the crowd threw items at Plaintiffs.  Many in the crowd objected loudly to Plaintiffs' message.

For both 2004 and 2005, Plaintiffs admit that the City did not condition their ability to appear in the parade on the materials that they displayed or distributed, or the message that they preached.  (Grove Dep. 16:8-19:2; *cf.* Pls. [*sic*] Answer to Defs. [*sic*] Concise Stmt. of Undisp. Facts ¶¶ 13-20.)  The City did not limit the number of individuals that could participate in Plaintiffs' entry in the parade, nor did Defendant stop any member of Plaintiffs' group from walking. (Grove Dep. 16:8-19:2; *cf.* Pls. [*sic*] Answer to Defs. [*sic*] Concise Stmt. of Undisp. Facts ¶¶ 13-20.)

### B.   <u>Procedural History</u>

Plaintiffs commenced this action on October 27, 2005, under 42 U.S.C. § 1983, alleging violation of their rights of free speech, free assembly, and free exercise of religion.  They sued the City of York and Mayor John Brenner, Police Commissioner Mark Whitman, and City Solicitor Donald Hoyt, in their official and individual capacities.  (Doc. 1.)  On September 26, 2006, the parties stipulated that all claims against the human defendants in their individual capacities be dismissed with prejudice and that all claims against them in their official capacities be merged with the claim against the City itself.  (Doc. 21.)  This court granted the order dismissing them on September 27, 2006.  (Doc. 22.)  On September 29, 2006, the parties filed cross motions for summary judgment (Docs. 23, 27) and supporting briefs (Docs. 24, 29).  They have each filed responsive briefs (Docs. 35, 37), and the City filed a reply brief (Doc. 40).  The court ordered additional briefing which is complete.  The matter is now ripe for disposition.

II.          **Legal Standard – Summary Judgment**

_____Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232.

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

8

The standards governing the court's consideration of cross-motions for summary judgment are the same as those governing a single motion for summary judgment. *Raymond Proffitt Found. v. EPA*, 930 F. Supp. 1088, 1096 (E.D. Pa. 1996). The court must construe the motions independently however, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Id.*

## III.      Discussion

Plaintiffs contend that Defendant City of York is liable under § 1983 for violating their constitutional rights of free speech, free assembly, and free exercise of religion. Section 1983 provides recourse for any person who has been deprived of his constitutional or federal rights by a defendant acting under the color of law. 42 U.S.C. § 1983; *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). A defendant acts under the color of law when, in the course of the alleged actions against the plaintiff, the defendant was "invested with the power and authority of the state." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). Plaintiffs have dismissed the individual defendants from this suit, retaining the City of York as the sole defendant. Accordingly, Plaintiffs bear the burden of showing that the City itself violated their Constitutional rights. The court will address the issue of municipal liability under § 1983 first, then analyze Plaintiffs' constitutional claims against the municipality.

### A.      Municipal Liability Under § 1983

A municipality may be found liable under § 1983 only when the municipality itself has caused a constitutional violation. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). The Supreme Court has rejected attempts to hold municipalities liable under the theories of *respondeat superior* or vicarious liability.

9

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989).  Rather, a plaintiff must show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1997).  A municipality is like any corporation, able to conduct its business only through natural persons authorized to act on its behalf.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988).  Thus, a municipality will be liable under § 1983 only when a plaintiff proves that a constitutional injury was caused by the conduct of the municipality's lawmakers or those individuals whose actions may fairly be said to represent official municipal custom or policy.  *Id.* at 121-22; *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).  Individuals whose actions are deemed to reflect official municipal custom or policy are deemed "policymakers."  *See Hill*, 455 F.3d at 245.

It is a matter of law for the court to determine whether an individual is a policymaker for purposes of municipal liability under § 1983.  *Praprotnik*, 485 U.S. at 124; *Hill*, 455 F.3d at 245.  The court's decision is informed by state law and local ordinances that describe the functions and responsibilities of a particular official.  *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997).  Because statutes and codes are not always clear on the issue, the court may also look to the practical aspects of an official's job.  *Praprotnik*, 485 U.S. at 125.  A municipal official is a policymaker when the official is "responsible for making policy *in the particular area* of municipal business in question" and when "the official's authority to make policy in that area is *final and unreviewable*."  *Hill*, 455 F.3d at 245.  Consequently, a municipal official may be a policymaker under some circumstances and not others.  *McMillian*, 520 U.S. at 785 ("[W]e are not seeking to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in.").

For § 1983 liability to attach to a municipality, a policymaker must acquiesce to a municipal custom or establish a municipal policy that violated a plaintiff's constitutional or civil rights.[3] *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  In the Third Circuit, a municipal custom exists "when, though not authorized by law, '[the] practices of state officials [are] so permanent and well-settled' as to virtually constitute law." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).  A municipal policy, on the other hand, exists when a policymaker takes action or issues an official proclamation, policy, or edict.  *Bielevicz*, 915 F.2d at 850; *Hill*, 455 F.3d at 245.

The two officials of the City of York alleged to be policymakers under this paradigm are Mayor John Brenner and James Gross, Director of Public Works.  The court looks to the Optional Third Class Charter Law of Pennsylvania, the City's Administrative Code, and the practicalities of their job functions to determine whether Mayor Brenner and Mr. Gross are policymakers for present purposes.  After reviewing all sources, the court concludes that Mayor Brenner is a policymaker for the City with respect to the press release issued in 2005 and Mr. Gross is a

---

[3]Defendant filed a motion *in limine* to exclude certain evidence from the Halloween Parades held in 2002 and 2003.  (Docs. 32, 52.)  Because of the very specific paradigm of municipal liability, the court will grant the motion in part and deny it in part.  Evidence is relevant and admissible if it shows action by a "policymaker" of the City of York to create policy for the City or to follow a custom of the City that infringes upon Plaintiffs' First Amendment rights.

Accordingly, the court will grant Defendant's motion with respect to actions taken by police officers during the 2002 parade because Plaintiffs have not connected the actions of the policy to actions by a City policymaker.  *See Bd. of County Comm'rs*, 520 U.S. at 405 (police officers are employees of a municipality, not policymakers).  The court will deny Defendant's motion regarding the 2003 press release and Assistant Solicitor Hoyt's instructions to Plaintiffs in 2003 because this evidence is relevant to show a municipal custom of regulating the speech of anti-abortion activists.  Plaintiffs may not *recover* for the events in 2003 because the settlement agreement entered in 2004 released all claims by Plaintiffs in *Grove I* against the City, including those based on events that took place in 2003.

policymaker for the City with respect to the organization and execution of the
Halloween Parades of 2004 and 2005.

### 1.   Mayor John Brenner

Plaintiffs argue that Mayor Brenner was a policymaker for the City of
York when his office issued a press release regarding the parade in 2005 and when
he allegedly made certain comments about Plaintiffs' entry in the 2004 parade.  The
court concludes that he was a policymaker for purposes of the press release, but not
for purposes of the statements ascribed to him.  Under the Third Class City Charter
Law, the mayor is vested with the executive power of the municipality.  53 Pa. Cons.
Stat. Ann. § 41411.  The mayor is charged to enforce the charter of the city, and all
general laws applicable thereto, and to supervise the departments of the city
government.  § 41412.  The mayor must approve all ordinances proposed by the city
council before they take effect.  § 41413(a).  The Administrative Code of the City of
York mirrors these provisions of the Optional Third Class Charter Law.  *See*
Codified Ordinances of York, Admin. Code §§ 123.01-123.04.  As predicted by
*Praprotnik*, the state law and city ordinances here do not shed a great deal of light
on whether Mayor Brenner is a "policymaker" for the City of York on the facts at
hand.

Mayor Brenner was a policymaker for the City when his office issued a
press release on October 27, 2005,[4] entitled "Note to Parents Regarding Halloween
Parade" ("Note").  (Pls.' App. 8.)  It is not clear what area of municipal business the
Note addresses or whether the Mayor's authority to make policy in such area is final
and unreviewable.  *See Hill*, 455 F.3d at 245.  Even so, the court concludes that the

---

[4]The Mayor's office issued a substantially similar press release in 2003.  (Pls.' App. 7.)

Mayor acted as a policymaker for the City when he issued the press release because of the manner in which it was executed and issued.  The Mayor sent the Note to Assistant City Solicitor Hoyt[5] for approval before sending it out.  (Hoyt Dep. 11:4-11.)  This action indicates that the Mayor believed that the Note was a matter of City business and sought assurance that the City would not incur legal trouble because of it.  It appears that the Mayor issued the press release only after receiving Mr. Hoyt's approval of the text.  (*Id.* 11:10-11.)  Further, the release is issued on City of York letterhead and purports to reflect the views of the City itself, not merely the personal opinion of the Mayor.  (Pls.' App 8.)  Because the 2005 Note was vetted for propriety for the sake of the City and was issued from the Mayor's office in the name of the City of York (*id.*), the court concludes that Mayor Brenner was a policymaker for purposes of issuing the press release.  As an "official proclamation or edict," it is a statement of policy for the City and if it infringed upon the First Amendment rights of the Plaintiffs, the City will be liable.  *See Bielevicz*, 915 F.2d at 850.

Mayor Brenner was not a City policymaker for purposes of certain statements attributed to him during the 2004 Halloween Parade.  The court concludes that even if the statements are properly before the court on summary judgment[6] and assuming without deciding that he did say them, Mayor Brenner was not acting as a policymaker for the City when he made the statements.  Plaintiffs were told by Brian Wade that the Mayor was warning attendees that Plaintiffs'

---

[5]Although his title is "Assistant" City Solicitor, Mr. Hoyt is the primary legal advisor to the City of York.  (Hoyt Dep. 5:7-6:2.)

[6]The court has grave doubts about whether the statements are properly considered on summary judgment because they are very likely inadmissible if this case were to go to trial.  *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (Hearsay evidence may be considered by the court on a motion for summary judgment only if it would be admissible at trial.).

group would be walking at the end of the parade and to protect their children from the sight of the graphic photographs.  (Grove Dep. 26:3-27:16; Stegman Dep. 14:24-15:13; Pls.' App. Attach. C.)  Then, as Plaintiffs' entry approached the reviewing area, the announcer said that "as Mayor Brenner had said at the beginning, [the York City fire engine] is being followed by something you may well not want your children to see, so this is basically the end of the parade.  The last entry in the parade is entitled Dr. Butcher's Chop Shop, displaying the horrors of abortion and the wickedness of Halloween."  (Pls.' App. Attach. C; *see* Grove Dep. 27:11-28:5; Stegman Dep. 15:3-7.)

 Assuming without deciding that Mayor Brenner made these alleged statements, there is no evidence that he was acting as a policymaker for the City of York as he did so.  Again, the court has difficulty identifying the "particular area of municipal business" for which Mayor Brenner was responsible when he made the alleged statements, much less that his "authority to make policy in that area was final and unreviewable."  *See Hill*, 455 F.3d at 245.  Instead, the comments seem to be the Mayor's personal perspective.  Unlike the press release, these statements show no sign of review by other City officials on behalf of the City or any other official imprimatur of the City of York.  A mayor is not a policymaker for his city under every circumstance or with every statement he makes.  *See McMillian*, 520 U.S. at 785.  Thus, these statements were not made in acquiescence to a City custom or to establish City policy.  Even if Mayor Brenner said these things, the City would not be liable for his words.

### 2.    James Gross, Director of Public Works

Plaintiffs next argue that Mr. Gross was a policymaker for the City of York when he placed Plaintiffs last in the Halloween Parades because he was responsible for the particular area of the organization and execution of the Halloween Parades in 2004 and 2005 and he had final and unreviewable authority to make policy in that area.  The court agrees.  Mayor Brenner appointed Mr. Gross to be Director of Public Works.  (Gross Dep. 6:22-7:3, Sept. 13, 2006.)  As Director, he is responsible for constructing and maintaining City streets, sidewalks, and all other City-owned property.  York Admin. Code § 141.01-02.  Mr. Gross is also responsible for administering special events for the City.  (Gross Dep. 8:2-7.)  The Department of Public Works outsources to a consulting firm the organization, marketing, and fund-raising work of special events in the city.  (*Id.* 7:18-8:12.)  Even so, Mr. Gross must retain some supervisory authority over the work of the consultants on behalf of the City.  A number of people provided input on Plaintiffs' position in the parades.  (Gross Dep. 11:10-21, 18:17-24.)  Mr. Gross, however, was the final authority on the decision because he was the Director of the Department of Public Works.  (*Id.*; Resps. to Pls.' Interrogs. Dir. to Defs. ¶ 4.)  There is no indication that his decision was subject to review by any other municipal official or entity.

The court concludes, therefore, that Mr. Gross was a policymaker for the City of York for purposes of the municipal business of setting the order of appearance in the Halloween Parades of 2004 and 2005.  Thus, when he took the action of placing Plaintiffs last in the parade, it was an action that created policy for the City of York.  *See Bielevicz*, 915 F.2d at 850; *Hill*, 455 F.3d at 245.  Accordingly, the City may be held liable under § 1983 if his actions violated Plaintiffs' constitutional rights.

**B.      Plaintiffs' Constitutional Claims**

Now the court turns to the question of whether the acts of City policy, issuing the press release in 2005 and placing Plaintiffs last in the 2004 and 2005 parades, violated Plaintiffs' First Amendment rights of free speech, peaceful assembly, and free exercise of religion.  These rights are cognates of one another and though not identical are inseparable.  *Thomas v. Collins*, 323 U.S. 516, 530 (1945).  The Fourteenth Amendment to the United States Constitution protects citizens' First Amendment rights from being encroached by the States.  *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).  Regulation of First Amendment rights is subject to exacting judicial review.  *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981).  The court will address each right in turn.

**1.      Free Speech**

Defendant City of York violated Plaintiffs' right to free speech by placing them at the end of the parade.  The First Amendment protects speech and other expressive activity in public places.  The right to free speech is not completely unfettered, however.  *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.").  In a traditional public forum,[7] the government may impose reasonable restrictions on the time, place and manner of speech.  *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995).  Such restrictions are constitutionally sound when they apply without reference to the content of the speech being regulated, they are narrowly tailored to further a significant

_____

[7]There is no question between the parties that Plaintiffs' actions occurred in a traditional public forum.

government interest, and they leave open ample alternative channels of conveying one's message. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

A regulation of speech imposed because of the content of the message is presumptively unconstitutional. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 817 (2000); *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992). A content-based regulation is subject to strict scrutiny such that it is constitutionally sound only if it is "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *accord Boos v. Barry*, 485 U.S. 312, 321 (1988). When a government entity restricts speech because of its content, the government bears the burden of proving the constitutionality of its actions. *Playboy Entm't Group*, 529 U.S. at 816. The court must determine whether the restriction is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *accord Boos*, 485 U.S. at 329.

A regulation on speech imposed because of the expected reaction by the people who hear it is, as a matter of law, content-based. *E.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *contra Frye v. Kansas City Missouri Police Dept.*, 375 F.3d 785, 790 (8th Cir. 2004) (holding that police confiscation of large signs depicting dismembered, aborted fetuses because they led to traffic disruption was a content-neutral regulation on speech). Here, Plaintiffs contend that the City of York impermissibly regulated their speech through the press release issued in 2005 and their placement at the end of the parades in 2004 and 2005.[8] They argue that these actions were taken because of the anticipated public

---

[8]The court recognizes that Plaintiffs claim that they were placed after the last official entry in the parades in 2004 and 2005. The City argues that Plaintiffs were included in the parade but were the
(continued...)

response to their message, thus, they were content-based regulations of Plaintiffs' speech.

The press release, "Note to Parents Regarding Halloween Parade," was not a regulation of Plaintiffs' speech and did not violate their First Amendment rights.  The Note stated that Plaintiffs' group will be walking in the Halloween Parade and "[t]he information that [they planned] to distribute and [their] parade entry may be considered offensive or graphic by recipients and it may not be appropriate for all audiences." (Pls.' App. 8.)  It informed readers that Plaintiffs' material "does not reflect the views of the City of York." (*Id.*)  The Note observed that Plaintiffs had the right to preach and distribute the material under all applicable laws. (*Id.*)  This language provided information to interested parties, it did not regulate Plaintiffs' speech.  Stating that Plaintiffs' views are not that of the City of York is not impermissible under the First Amendment.  Plaintiffs' argument that the Note shows official municipal "hostility" towards their message (Doc. 24 at 11) is not sufficient to prove that the Note violated their First Amendment rights.

The City did regulate Plaintiffs' speech by placing them last in the parade.  It was a content-based regulation because it was done in anticipation of the crowd's reaction to Plaintiffs' message.  *See Forsyth County*, 505 U.S. at 134.  The court must therefore conduct the strict scrutiny analysis to determine 1) whether the City had a compelling interest for taking those actions; 2) whether the City's actions were necessary to serve that compelling interest; and 3) whether there were less restrictive means available to the City that would have been effective.  *See Ward*, 491 U.S. at 791.  The City argues that it had a compelling interest in protecting the

---

(...continued)
final official entry each year.  This conflict is a distinction without a difference for purposes of this legal analysis.

safety of the parade-going public.  Public safety, the court agrees, is a compelling government interest.  *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999).  Thus, the court moves on to question two: was placing Plaintiffs last in the parade *necessary* to serve the City's compelling interest in public safety?

A government must have some ability to protect from harm a speaker, the audience, and public and private property near the place of a potentially hostile speech environment.  *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 374-75 (D.C. Cir. 1992).  Indeed, if police did not protect unpopular speakers, many a rally or protest would likely devolve into a scrum in which no one's right to free speech could survive.  *See Grider*, 180 F.3d at 747-48.  Thus the government has a duty to protect the safety and speech rights of those who convey an unpopular message.  *Glasson v. City of Louisville*, 518 F.2d 899, 906 (6th Cir. 1975).  Accordingly, a government may – in fact, must – take steps to protect an inflammatory speaker.  The government must opt for measures that ensure public safety and that effect the least restriction on freedom of speech.  *See ACLU*, 542 U.S. at 666.

It is clear from the history of the Halloween Parades that many in the audience were hostile to Plaintiffs' message.  Although no serious violence was threatened or occurred in 2004 and 2005, it is reasonable that the City anticipated a need for enhanced measures to ensure the safety of the public and Plaintiffs in light of the history of angry crowd reaction to Plaintiffs' message.  The City would have been remiss in its duty to protect Plaintiffs' right to free speech if it had failed to provide proper police protection to Plaintiffs as they walked amidst the often antagonistic crowd.

To that end, the City is emphatic that it was necessary to put Plaintiffs at the end of the parades to effectuate its compelling interest in preserving public

safety.  The City claims that if Plaintiffs were placed in the middle or in the front of the queue, and were forced to stop because of an altercation with the crowd, the other parade units would be forced to stop and the parade itself would be disrupted. (Br. in Supp. of Defs.' [*sic*] Mot for Summ. J 12; Arnold Decl. ¶ 5.)  Placing Plaintiffs last also ensured ease of access to the group for police to respond to potential incidents.  (Br. in Supp. of Defs.' [*sic*] Mot for Summ. J 12; Arnold Decl. ¶ 5.)  Additionally, because police officers could join the coterie around Plaintiffs at the end of the parade once it passed their assigned corners, there would be additional police protection for Plaintiffs as they progressed on the route if they were placed at the end.  (Br. in Supp. of Defs.' [*sic*] Mot for Summ. J 12; Arnold Decl. ¶ 5.)

        The court reads these arguments as evidence that it was not, in fact, necessary to place Plaintiffs at the end of the parades to ensure public safety. Taking them in turn, the court finds that stopping or starting the parade because of potential "incidents" involving Plaintiffs is not a matter of public safety.  It is a matter of convenience to the City to have the parade follow along smoothly.  Free speech is "protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."  *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).  An occasional pause in a parade may be an inconvenience, but it does not rise to the level of a clear and present danger of substantive evil.  The proposition that additional police protection would be available at the end of the parade also shows that Plaintiffs' placement was not necessary to furthering the City's interest in public safety.  If increased police presence was necessary to ensure public safety, the City should have provided that protection from the beginning.  It may have been easier for the City to add on police officers as the parade passed.  It may have been less expensive for the City to use officers already on duty than to

bring in additional members of the force on a weekend.  But placing Plaintiffs last was not *necessary* to ensure public safety.  What *was* necessary was that Plaintiffs had adequate police protection to convey their message in the face of shouts and threats from the crowd.  Such adequate protection could have been afforded them anywhere in the parade, if the City had been willing to staff Plaintiffs' entry appropriately from the outset, rather than counting on tag-along officers to fill out the ranks as the parade passed by.  Plaintiffs' placement was not necessary to fulfill the City's interest in public safety; it was convenient.

Case law regarding threats of violence during other parades and rallies supports the court's conclusion.  In the face of a screaming mob of one thousand people or more who were throwing sticks, stones, and bricks, the Chicago police were out in force to protect an incendiary speaker.  *Terminiello*, 337 U.S. at 3.  Justice Jackson asked, "[w]hat would Terminiello's theoretical freedom of speech have amounted to had he not been given active aid by the officers of the law?  He could reach the hall only with this help, could talk only because they restrained the mob, and could make his getaway only under their protection."  *Terminiello*, 337 U.S. at 31 (Jackson, J., dissenting).  The right to free speech "would have no reality if Chicago should withdraw its officers to some other section of the city, or if the [officers] assigned to the task should look the other way when the crowd threatens."  *Id.* at 31-32.  "No one will disagree that the fundamental, permanent and overriding policy of police and courts should be to permit and encourage utmost freedom of utterance."  *Id.* at 32.

Drawing on this vital role of the police, to permit and encourage the utmost freedom of speech, police forces across the country routinely take extra precautions to protect hostility-inducing speakers.  The Metropolitan Police Department of Washington, D.C., mobilized more than 3,500 police officers to keep

the peace and protect members of the Christian Knights of the Ku Klux Klan from violent counter-demonstrators as they marched eleven blocks down Constitution Avenue. *Christian Knights of the Ku Klux Klan Invisible Empire*, 972 F.2d at 367. The District wanted to limit the KKK to four blocks, but the court ordered the city to provide protection along the entire route because the threat of violence was not beyond reasonable control. *Id.* at 376. In Louisville, Kentucky, police took "extensive" measures to ensure the safety of speakers and attendees at competing rallies given by the Ku Klux Klan and a group in opposition to the Klan. *Grider v. Abramson*, 994 F. Supp. 840, 842 (W.D. Ky. 1998). Those measures included establishing complex perimeters around the rally sites, conducting protective sweeps of the area in search of weapons in advance of the rallies, requiring all attendees at either rally to pass through a metal detector to check for weapons, and having 600 police officers on call in the event of a violent outburst. *Id.* at 842-43. While the anticipated violence in these cases rises far above the level of that expected against Plaintiffs in the York Halloween Parades, they also demonstrate that if extra police protection is required to protect an unpopular speaker, a municipality must provide that protection. York may not have the same resources available as Washington, DC, or Louisville, but the court has not been presented with any evidence that the City was without the capacity to adequately staff the parades. The City's arguments turn on convenience, not necessity. Relegating a speaker to a less-obtrusive location solely for the convenience of the municipality is an impermissible regulation of speech. Here, the City relegated Plaintiffs to the least-obtrusive location in its Halloween Parades, last, because it was the most convenient location for the City. Because this content-based regulation was not necessary to ensure public safety, placing Plaintiffs last violated their right to free speech. Summary judgment will be entered for Plaintiffs on this claim.

22

It follows from the foregoing that putting Plaintiffs last would not have violated their right to free speech if placement was made according to content-neutral criteria.  The City repeatedly insists that "placement of Plaintiffs' entry in the [p]arade[s] was consistent with the rules and regulations for the [p]arade[s]."  (*E.g.*, Br. in Supp. of Defs.' [*sic*] Mot. for Summ. J. 12.)  The parade rules and regulations provided, however, do not state how the order of the queue was determined.  (*See* Pls.' App. at 12-16; Def.'s Ex. N.)  Placement does not depend on order of application, request by entrants, or longevity of participation in the parades.  (Gross Dep. 22:3-7.)  It seems that the decision is guided solely by diversity.  According to Mr. Gross, "we tried to spread out the entries based on whether they are musical type groups or whether they are floats or whether they are individual people walking or antique cars."  (*Id.*)  The court takes note that the City is no longer involved in producing the Halloween Parade held in York, having found a private organization to run it.  If, however, the City were to resume responsibility for the parade, it would be advised to create and publicize a set of content-neutral standards for determining the order of entries in the parade.  Placement could depend on a lottery, order of receipt of application, order of longevity of participation in the parade, or some such other mechanism that ensures content-neutrality while still providing a diverse mix in the parade queue.

### 2.   Free Assembly

Defendant City of York violated Plaintiffs' right to free assembly.  The First Amendment ensures citizens the right to assemble peacefully.  This right is particularly important to protect the speech rights of those who espouse views that are unpopular with the majority of their fellow citizens.  *Roberts v. United States*

*Jaycees*, 468 U.S. 609, 622 (1984).  There is a close nexus between the freedom of speech and the freedom of assembly because group association undeniably enhances "[e]ffective advocacy of both public and private points of view, particularly controversial ones."  *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *accord DeJonge v. Oregon*, 299 U.S. 353, 364 (1937) (right to peaceably assemble is a "right cognate" of the right to freedom of speech).  The close nexus between these rights is also evidenced by the fact that an individual's freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.  *See NAACP,* 357 U.S. at 460-61.  Accordingly, state action that burdens the freedom of citizens to assemble peacefully is subject to the same strict scrutiny as a state action that curtails their freedom of speech.  *See id.*; Ronald D. Rotunda & John E. Nowak, 4 Treatise on Const. L. § 20.54 (3d ed. 2006) ("If a governmental action regulating speech in public places would violate the freedom of speech, that governmental action might also be stricken as a violation of the freedom of assembly.").

       Here, the rights of freedom of speech and freedom of assembly cannot be separated.  These individual Plaintiffs formed part of a group that came together to espouse a message that is not popular with the wider public.  They gathered as a group not only because their religious beliefs compel group activity, but because it is safer to exercise their freedom to express unpopular views when accompanied by sympathetic individuals, rather than alone.  (*See* Pls. [*sic*] Br. in Supp. of [*sic*] Mot. for Summ. J. 14.)  Plaintiffs' videotapes of their participation in the 2004 and 2005

parades show that the crowds along the route were overtly hostile to Plaintiffs' message.  (Pls.' App. Attach. C & D.)

The court has already found that the City impermissibly regulated Plaintiffs' speech by placing their entry last in the parade.  For the same reasons, the action taken by Defendant City of York in placing them last does not withstand strict scrutiny on the freedom of assembly claim.  This discrimination against the group inherently infringes upon the assembly rights of the members of the group. *See NAACP*, 357 U.S. at 460-61.  Defendant argues that Plaintiffs themselves admit that the City did not limit the number of people who could walk with Plaintiffs and that no one who sought to walk with their group was prevented from doing so by the City.  (Grove Dep. 16:8-19:2; *cf.* Pls. [*sic*] Answer to Defs. [*sic*] Concise Stmt. of Undisp. Facts ¶¶ 13-20.)  The court accepts these facts as true for purposes of summary judgment, but they do not exonerate the City under First Amendment precedent.  The act of discriminating against the group's message curtailed Plaintiffs' right to assemble.  Accordingly, summary judgment will be entered for the Plaintiffs on this claim.

### 3.   Free Exercise of Religion

Defendant City of York did not violate Plaintiffs' right to free exercise of their religion.  The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  It applies to the states by way of the Fourteenth Amendment. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  Simply stated, individuals have the right to profess and believe any religious belief they desire. *Employment Div., Dep't of Human Res. v. Smith,* 494 U.S. 872, 877

(1990).  The right to exercise one's religion freely means more, however, than the protection of belief and profession of that belief.  It often involves the performance of physical acts, including assembling with others for worship or proselytizing.  *Id.* at 877-78.

The court is not to question the validity of a religious belief or act.  Rather, the Free Exercise Clause is implicated when conduct is motivated by "beliefs which are both sincerely held and religious in nature."  *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (*en banc*).  The court accepts as true Plaintiffs' assertion that their practice of preaching against abortion is a religious act motivated by a sincerely held religious belief.  ([Pls.'] Stmt. of Mat'l Facts ¶¶ 1-4.)  Thus, the court will review their claim under the Free Exercise analysis.

The analysis must be undertaken when it is alleged that a law "discriminates against some or all religious beliefs or regulates or prohibits conduct *because* it is undertaken for religious reasons."  *Church of the Lukumi Babalu Aye*, 508 U.S. at 532 (emphasis added); *accord Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002).  A state action alleged to burden a plaintiff's right to free exercise of religion can prompt either rational basis review or strict scrutiny.  *Tenafly Eruv Ass'n,*, 309 F.3d at 165.  A law that is neutral and generally applicable is subject to rational basis review even if it creates an incidental burden on religious conduct.  *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.  If a law is not neutral or not generally applicable, however, strict scrutiny must be applied.  *Id.* at 531-32 (1993); *Tenafly Eruv Ass'n,*, 309 F.3d at 165.  A law is not neutral if its object "is to infringe upon or restrict practices *because of their religious motivation*."  *Church of the Lukumi Babalu Aye*, 508 U.S. at 533 (emphasis

26

added); *accord Tenafly Eruv Ass'n*, 309 F.3d at 165.  A law is not generally applicable when the governmental interest the law seeks to advance is pursued *only* against religiously-motivated conduct.  *Church of the Lukumi Babalu Aye*, 508 U.S. at 542-43*; accord Tenafly Eruv Ass'n*, 309 F.3d at 165.

A law that burdens religious practice must "advance interests of the highest order and must be narrowly tailored in pursuit of those interests" to survive strict scrutiny.  *Church of the Lukumi Babalu Aye*, 508 U.S. at 546 (quotations omitted).  The government may not "discriminate between religiously motivated conduct and comparable secularly motivated conduct in a manner that devalues religious reasons for acting." *Tenafly Eruv Ass'n*, 309 F.3d at 169.  The strict scrutiny analysis may also be proper when the right to free exercise of religion is burdened in conjunction with other First Amendment rights. *Smith*, 494 U.S. at 881; *Tenafly Eruv Ass'n*, 309 F.3d at 165; *but see Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295-97 (10th Cir. 2004) (noting scholarly criticism and likely narrow scope of the hybrid claim analysis).  Although the Third Circuit has suggested that it might apply at least somewhat heightened scrutiny to such hybrid claims, it has not done so. *See Tenafly Eruv Ass'n*, 309 F.3d at 165 n.26.

Though Supreme Court and Third Circuit precedent on free exercise involves state or local laws, at issue here is Defendant City of York's policy of placing Plaintiffs last in the Halloween Parades held in 2004 and 2005.  The proper question in the free exercise context is whether this policy is neutral and generally applicable.  The policy is not neutral if it restricted Plaintiffs' practice of preaching, carrying signs, and otherwise demonstrating against abortion *because* such practice was religiously motivated. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 532.

27

There is no indication that Defendant's actions toward Plaintiffs were taken because they were religiously motivated.  The evidence suggests quite the opposite, in fact. It appears that Defendant would have put Plaintiffs last even if their message was motivated by a purely secular opposition to the practice of abortion.  Similarly, Defendant's alleged policy or custom appears generally applicable, and not directed only at conduct motivated by religious impulses.  Thus, the court concludes that the policy was neutral toward religious activity and generally applicable.  It created an incidental burden on Plaintiffs' religious conduct because they were last, but they were still allowed to proselytize for the entire route of the 2004 and 2005 Halloween Parades.  The City did not violate Plaintiffs' right to free exercise of their religion. The court will enter summary judgment for the City on this claim.

**IV.** 	**Conclusion**

	For the reasons stated above, the court concludes that Defendant City of York violated Plaintiffs' rights of free speech and assembly, but did not violate Plaintiffs' right to free exercise of their religious beliefs.  Summary judgment will be entered accordingly.



	s/Sylvia H. Rambo
	SYLVIA H. RAMBO
	United States District Judge

Dated:  January 10, 2007.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES R. GROVE,** | : | Civil No. 1:05-CV-02205 |
| **DENNIS S. KRONE,** | : | |
| **PATRICIA STEGMAN, and** | : | **JUDGE SYLVIA H. RAMBO** |
| **DANIEL RILEY,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF YORK,** | : | |
| **PENNSYLVANIA,** | : | |
| | : | |
| **Defendant** | : | |

**O R D E R**

In accordance with the accompanying Memorandum of Law, **IT IS HEREBY ORDERED THAT**:

1) Plaintiffs' motion for summary judgment (Doc. 23) is **GRANTED** in part and **DENIED** in part as follows:

a) Plaintiffs' motion is **GRANTED** on Plaintiffs' First Amendment free speech and free assembly claims against Defendant; and

b) Plaintiffs' motion is **DENIED** in all other respects;

2) Defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part as follows:

a) Defendant's motion (Doc. 27) is **GRANTED** on Plaintiffs' claim that Defendant violated their First Amendment right of free exercise of religion; and

b) Defendant's motion is **DENIED** in all other respects;

3) The parties shall proceed to trial on the issue of damages requested by Plaintiffs for nominal and compensatory damages, costs, expenses, and attorney's fees;

4) Defendant's motion *in limine* (Doc. 50) is **GRANTED** with respect to the evidence from 2002 as identified therein and **DENIED** in all other respects;

5) The deadlines established in this court's order of December 4, 2006 (Doc. 49) remain in effect; and

6) The clerk of court shall defer entry of summary judgment until the conclusion of this case.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  January 10, 2007.